```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    -------------------------------------x
 3  BASHAM, RINGE Y CORREA, S.C.
    Paseo de Los Tamarindos No. 100 Piso 5
 4  Bosques de Las Lomas, 05120
    Cuajimalpa de Morelos,
 5  Ciudad de Mexico, Mexico,

 6                         Plaintiff,

 7                                     23 CV 8223(NSR)(AEK)
         -vs-
 8                                     DISCOVERY CONFERENCE
                                        (via Teams)
 9  ARIZONA BEVERAGES USA LLC
    One Arizona Plaza, 60 Crossways Park Drive
10  Suite 400,
    Woodbury, NY 11797-2018,
11                         Defendant.

12  -------------------------------------x

13                             United States Courthouse
                               White Plains, New York
14                             July 29, 2025

15  Before:  THE HONORABLE ANDREW E. KRAUSE,
                          United States Magistrate Judge
16
    APPEARANCES:
17
    SEQUOR LAW
18       Attorneys for Plaintiff
         1111 Brickell Avenue
19       Suite 1250
         Miami, Florida 33131
20  NYANA ABREU MILLER
    ROBERT KEARNEY
21
    CUDDY & FEDER LLP
22       Attorneys for Defendants
         445 Hamilton Avenue, 14th Floor
23       White Plains, New York 10601
    JOSHUA E. KIMERLING
24
    **Transcribed from digitally recorded proceedings**
25
```

1           THE DEPUTY CLERK:  Good morning, all.  This is the

2    matter of Basham, Ringe and Correa S.C. versus Arizona Beverages

3    LLC, Docket No. 23-cv-8223, the Honorable Andrew Krause

4    presiding.

5           Counsel, please note your appearance for the record,

6    starting with plaintiff's counsel.

7           MS. MILLER:  Good morning, Your Honor.  This is Nyana

8    Miller.  I am here, together with my colleague Robert Kearney,

9    on behalf of the plaintiff.

10          THE COURT:  Good morning, Ms. Miller.  Good morning,

11   Mr. Kearney.

12          MR. KIMERLING:  Good morning, Your Honor.  Josh

13   Kimerling of the law firm of Cuddy & Feder on behalf of the

14   defendant.

15          THE COURT:  Good morning, Mr. Kimerling.  You know,

16   that -- "on behalf of the defendant" sort of prompts my first

17   question for you, Mr. Kimerling.  I feel like we may have talked

18   about this at one of our prior conference back in February or

19   April; but are you actually representing the non-party subpoena

20   recipients as well, or are you only representing the defendant

21   Arizona Beverages USA LLC?

22          MR. KIMERLING:  No.  I think for purposes of this,

23   yes, I am representing all of the proposed parties, the

24   nonparties at this point as well.

25          THE COURT:  Okay.  All right.  That's good to know.

1   Thank you.

2           All right.  We are here for a discovery hearing.  I

3   have reviewed your letters at ECF Nos. 41 and 42 in advance of

4   today's conference, and we will work through those issues, and

5   hopefully we can get to some sort of resolution.

6           Let me just start out by saying that I think there is

7   a very valid point in the defendant's response to this

8   affirmative dispute, which is to say there are no allegations of

9   alter ego liability in the current operative pleading.  There

10  just aren't.  There -- there, obviously, is the proposed amended

11  complaint.  That's still a pending motion.  I actually will tell

12  you that I did communicate with Judge Román about that last week

13  to ascertain whether he intends to handle that motion himself or

14  whether he wants me to handle it.  It is technically within the

15  order of reference for general pretrial supervision, but I will

16  tell you from experience -- and you probably have seen this

17  before in different cases -- different district judges have

18  different preferences with respect to motions for leave to

19  amend.  Sometimes they choose to handle them themselves.

20  Sometimes they choose to have a magistrate judge handle it in

21  a -- within the order of reference.  And I will say that

22  different district judges sometimes make different choices in

23  different cases.  So I don't know exactly whether that motion is

24  technically before me or before Judge Román.  We haven't

25  really -- he hasn't made a final determination as to that yet.

1          So in any event, that's -- if the motion for leave to

2  amend is granted, and all of the claims that are alleged in the

3  propose amended complaint come into the case, then discovery

4  will be broader and different.

5          At the same time, there is a degree to which -- and

6  I'm mindful of this point from the plaintiff's letter as well --

7  there is a degree to which Arizona Beverages USA, the actual

8  defendant in the original pleading, the currently operative

9  pleading, has asserted defenses that at least -- "implicate" is

10 not the word -- but refer to the Mexico entity, the entity that

11 is referred to in one or both of the letters as ABMX.  I am

12 going to refer to that as ABMX.

13         So it strikes me that even within the context of the

14 original complaint, the currently operative pleading, discovery

15 from, at a minimum, from Arizona Beverages USA that touches upon

16 ABMX is relevant, and discovery from ABMX itself may also be

17 relevant.

18         Now, the connection from there to the other entities

19 that are the subpoena recipients, Arizona International LLC and

20 Beverage Marketing USA, for short letters as BMU.  I just want

21 to make sure we are using all the right acronyms.  I know there

22 is ABUSA as well, but for some reason I don't love that acronym.

23         So anyway, BMU and Arizona International LLC, that

24 feels like it's a step removed to me.  Again, just from my

25 initial perusal of the pleadings in connection with this motion

1  or this dispute and after having reviewed the parties' letters.

2  Again, Arizona Beverages USA has raised the specter of ABMX in

3  connection with its own pleadings in response to the currently

4  operative complaint, and the other entities -- I understand the

5  theory or the logic from the plaintiff's perspective is that

6  those entities are potentially related or intertwined with ABMX

7  in various ways, and there is -- that's before we even get to

8  the Glute 22 entity.  That's quite a name, for whatever it's

9  worth.  But, again, there may be interrelationships.  There may

10 be overlapping personnel.  There may be all kinds of information

11 there that is relevant if we end up in a world where we are

12 dealing with the amended complaint, but that seems like a step

13 removed or maybe even multiple steps removed from discovery from

14 Arizona Beverages USA into, of course, Arizona Beverages USA

15 itself and perhaps Arizona Beverages USA's relationship with

16 ABMX, particularly because Arizona Beverages USA has brought

17 ABMX into its defense of the case by asserting in a narrative

18 response in an answer, I guess is how I describe it,

19 Mr. Kimerling.

20         I have to say, you know, it's rare as a judge -- or as

21 a lawyer, frankly, in the years before I became a judge -- it's

22 rare that one looks at the answer, other than perhaps the list

23 of affirmative defenses, it's rare that one looks at a paragraph

24 in an answer and finds something as substantive as what you

25 included in paragraph 1.  I mean, it was sort of a speaking

1  answer almost, if you will.  It wasn't just an admit, deny or

2  DKI, and I actually found it very helpful in the context of this

3  case and sort of refreshing.  It sort of puts the lie to the old

4  saying that, you know, the answer is the most useless document

5  in litigation, which I'm sure we have all said at one point or

6  another in various cases.  But you know, here, you've actually

7  positioned this in a way as to, you know, a raise a defense

8  substantively and add factual matter as part of that answer that

9  arguably, and quite likely will expand the scope of discovery in

10  certain respects; but, you know, you did so in a way that I

11  think represented Arizona Beverages USA's good-faith position

12  with respect to this matter.  I mean, whether that's a valid

13  position or not is to be determined.  That's what this case is

14  about, but I do think we have to -- again, I am going to hear

15  from you on this -- but I am just giving you my preliminary

16  thoughts so we can work through the dispute with that as the

17  backdrop, but I do think that ABMX is in a different position

18  here vis-à-vis discovery than Arizona International LLC or BMU

19  based on the fact that we are in a world where we are still

20  dealing with the original complaint as the operative pleading,

21  and because the pleadings, including the answer, make reference

22  to ABMX in a meaningful and substantive way that really can't be

23  overlooked.

24            And from what I gather, this is not a concept that's

25  entirely foreign to all of you because in the plaintiff's letter

1  ECF No. 41, I noted that with respect to Item B 1 on page 3 of
2  the letter, that there was a distinction, for example, between
3  what ABMX had agreed to produce and what BMU and Arizona
4  International had agreed to produce.  And I'm not sure I saw
5  that carried through in all of the items in that Section B 1
6  through 8, but at least with respect to B 1 that seemed to be
7  some acknowledgment on the part of Arizona Beverages USA and
8  potentially ABMX that it might have obligations even within the
9  scope of relevance for the original complaint, which is the
10 current operative pleading, so --

11         And I will turn to you, Ms. Miller, for any reactions
12 to any of that or, you know, some further argument in support of
13 the points that you've raised in your complaint; but I mean --
14 not your complaint, but in your letter at ECF No. 41.  I would
15 like to sort of work through this in a way that allows us to get
16 to a point where I think some additional discovery probably does
17 need to be provided, but probably not all of what it is that you
18 are asking for.

19         Also, I'm sorry, I am going to stop talking in a
20 second, but the other thing to grapple with a little bit here is
21 that there are no written objections or substantive written
22 responses from the subpoena recipients to the demands, and that
23 makes it a little bit hard for me to adjudicate whether there
24 are valid objections or not.  I'm more than willing to sort of
25 work through this in this kind of semi-conceptual way, but it's

1  a little bit tricky without the precise framing that we get from

2  written objections.  And listen, it may be that with the

3  guidance and interaction that we have about this today, and some

4  concrete rulings as well, you may be able to go back and meet

5  and confer and figure out a path forward that would obviate the

6  need for the full written objections and you live to fight

7  another day about some of the other things, and we will revisit

8  some of that depending on the outcome of the motion for leave to

9  amend.  But if that doesn't work, it may be that to really tee

10 these up more precisely or tee up things that you can't agree

11 upon after receiving the guidance and direction that I am going

12 to give you today, that we'll need to have formal response so

13 that there can be more definitive and precise rulings on

14 particular points.

15         So that's just another thought for everybody to keep

16 in mind.

17         So, Ms. Miller, let me turn to you.

18         MS. MILLER:  Thank you, Your Honor.  And, you know,

19 this introductory overview statement has been very helpful just

20 in framing the issues.

21         Within the context of the original complaint I think

22 there are a couple -- the complaint and the answer, as Your

23 Honor stated, the answer referring and pointing the finger to

24 ABMX is quite useful.  I mean, probably saved us years of

25 litigation to argue about who was the correct entity as long as

1  they can point to someone who is the correct entity, but it

2  raises two issues which are relevant to our discovery requests:

3         One is which corporate entity within the structure

4  David Menashi and Martin Cunningham were representing in their

5  dealings with Basham.  Here, we had a draft agreement that

6  admittedly was not signed in the traditional sense; was ratified

7  by these two individuals in their words and their conduct and

8  their written communications, but their signature blocks don't

9  actually tell us which legal entity they represent.  Everyone

10  who works for the corporate conglomerate has an

11  @DrinkArizona.com email address, and the signature blocks simply

12  say "Arizona Beverages" or have the Arizona trademark, you know,

13  and they are all at corporate headquarters in New York, which

14  certainly implied to Basham that they were working for Arizona

15  USA.  So, you know, we are not required to take at face value

16  the information in the answer that we apparently were dealing

17  only with Arizona Mexico, and that's the reason for, you know,

18  the discovery requests relating to who these people really

19  worked for.

20         So we would like payroll statements.  We have

21  requested invoices because -- under a personnel-sharing

22  agreement that these corporate entities have.  So the corporate

23  entities do admittedly share employees and officers, and in the

24  discovery one of the documents that was very helpful with this

25  personnel-sharing agreement that the agreement calls for the

1  entities to invoice one another for the employees' time.  So we

2  would like to know, and I think it is probative who were David

3  Menashi and Martin Cunningham working for, which legal entity

4  was paying for their time when they were supervising Basham in

5  the litigation at issue?

6         The other questions about office space, you know, the

7  fact that they were using office space in New York was one of

8  the factors that led our client to believe that they were

9  dealing with Arizona USA as distinct from other work that they

10 performed where they knew they were dealing with Arizona Mexico

11 because they were instructed to address the invoices in a

12 certain way to Arizona Mexico, but when they were instructed to

13 address the invoices to the address in White Plains, they

14 believed that they were dealing with Arizona USA.  So

15 information about whether Arizona Mexico actually paid for any

16 office space or had an office there would be also relevant and

17 probative to that, you know, that part of the complaint.

18        Finally, in the answer we certainly get some

19 resistance about how the payments were made and the statement is

20 that Arizona Mexico made all of the payments.  There certainly

21 was an Arizona Mexico account opened up with that legal entity's

22 name we've now discovered, but we also see that, you know, we've

23 only received certain limited financial information, but in the

24 information that we did receive we did see two payments to

25 Basham where immediately before the payment another Arizona

1  entity sent the money to the account, and then that money was

2  transferred onward to Arizona Mexico.  So they were not Arizona

3  Mexico's own funds, and I think those are relevant especially to

4  our equitable claims about quantum meruit in the event -- and

5  unjust enrichment -- in the event that the Court does not find

6  that there was a contract that governed the relationship and

7  instead grants equitable relief.  Who actually paid?  Not, you

8  know, whose name was on the transfer, but the funds came from

9  another legal entity and therefore, that legal entity was

10 certainly given something in exchange for the services.

11            THE COURT:  Okay.  I mean, so I hear everything that

12 you are saying, Ms. Miller.  We lost your colleague, by the way.

13 Is that okay?  Do you --

14            MS. MILLER:  I am sorry.  Yes.  I am sure he will try

15 to get back on here.  Unfortunately, the internet in the D.C.

16 office is not always reliable.

17            THE COURT:  Okay.  There we go.  You are back,

18 Mr. Kearney.

19            MR. KEARNEY:  Sorry.  My internet cut out, I think.

20            THE COURT:  Yes.  No, that's fine.  We were just

21 saying that you had disappeared and whether we should wait for

22 you to come back, and then you were back before we even finished

23 that conversation.

24            Okay.  So, you know, I understand your point to some

25 degree, Ms. Miller, but you know that -- that still leaves the

072925                              Discovery Conference

1   question -- and we will hear from Mr. Kimerling on this -- as to

2   whether it's appropriate to seek that discovery from all of

3   these different entities, right?  You have subpoenas out to

4   three different entities.  You have document demands out to the

5   defendant Arizona Beverages USA, or whether it's appropriate at

6   least for now only to seek that information from Arizona

7   Beverages vis-à-vis its relationship with Arizona Mexico and

8   whether -- and its relationship with Mr. Menashi and

9   Mr. Cunningham, and whether it's appropriate to seek that also

10  from Arizona Mexico, ABMX, and/or whether it really is

11  appropriate to go beyond those entities to these others when

12  they are nonparties and when some of this information is really

13  in a lot of ways beyond the scope of the complaint.

14          I understand the ways you've tried to tie it back to

15  the complaint, but again, some of it is a bit of -- again, still

16  strikes me as a bit of a stretch; less so if you are trying to

17  get it from Arizona Beverages USA, but even there tailoring the

18  requests to information in the files of Arizona Beverages USA

19  vis-à-vis Menashi and Cunningham's relationship with BMX,

20  Arizona Beverages' relationship with BMX, and the same from BMX.

21  Again, going beyond BMX, who is -- ABMX -- which is, you know,

22  part of -- part of the pleadings in a meaningful way, just

23  strikes me as a bit of a stretch presently.

24          And I will say, you know, whether or not the materials

25  are located on the same servers or not, I think Mr. Kimerling

 1  made this point before, which I agree with.  I mean,

 2  Mr. Kimerling is not making an argument here as to burden,

 3  right?  And the location of the files might be relevant in that

 4  sense.  His argument is really as to relevance principally and

 5  maybe exclusively as a basis for objecting on behalf of the

 6  Arizona International and BMU entity.  And, you know, again, in

 7  light of the way that the allegations in the complaint are

 8  framed and the one defendant that is named and the other party

 9  that is referenced, you know, there is something that I find

10  compelling about that argument.

11          Again, I think from, what I understand, there are

12  probably some other things that Arizona Beverages and ABMX are

13  going to have to produce here, and I'm not sure, Mr. Kimerling,

14  if your view is that you took some of these positions because

15  you wanted to sort of tee this issue up to try to draw

16  appropriate lines or whether your position on behalf of your

17  various clients is that nothing should be produced about even

18  the relationship between Arizona Beverages USA and ABMX, either

19  from Arizona Beverages USA or ABMX.  I will turn to you.

20          MR. KIMERLING:  Sure, Your Honor.  I think your last

21  point was exactly my position.  I think we can stay away from

22  AZI or BMU.  As Your Honor noted, they are far removed from

23  this, so I will focus on ABX, Arizona Beverages Mexico.  And I

24  think even the domains, the requests being raised by counsel

25  with respect to Arizona Beverages Mexico still go far beyond

1  what is pled.  Regardless of the fact that my answer asserts

2  that the engagement, the question here is which party contracted

3  with Basham?  That's it.  Even the existing complaint, even the

4  answer, there is nothing in there that raises anything about

5  piercing, alter egos, you know, personnel.  The position taken

6  by Basham in its pleading, the only pleading here, is that they

7  were engaged by Arizona Beverages USA.  That's in their

8  paragraph 1 out of 61.  It is clear, the engagement, the valid

9  enforceable agreement was between those two parties.  My

10 position is simply that that is the wrong party.  That's why

11 in -- as Your Honor pointed out -- the paragraphs I did tell a

12 little bit of the story more so than I would normally do in an

13 answer, as Your Honor noted, and paragraph I think 98 is even

14 more detailed because the documents, in my opinion, tell the --

15 what really happened here, and I wanted to kind of -- even

16 though it's only a pleading, I wanted to have a neutral kind of

17 playing field on the pleadings themselves.

18         So but many of the requests, even though, yes, the

19 question is between ABMX and ABUSA, which is the party, I still

20 don't think that issue authorizes the plaintiff to seek

21 inter-corporate documents, shareholder documents.  If we just

22 had -- let's put it this way, Your Honor, if the complaint was

23 against ABMX, there would be no question they wouldn't be

24 entitled to banking information.  It's just simply:  Did ABMX

25 engage Basham?  Did they receive the invoice?  Did they pay for

1    the invoices?  What's the value of the services?  A straight,

2    you know, lawyer suit against a client.

3            So all of these things related to, you know, David

4    Menashi, Martin Cunningham, who they worked for, shared office

5    space, all of these things, banking information, that still is

6    beyond the scope of what I would argue is permissible discovery

7    here.  The only question is which party engaged currently --

8    currently -- the only question is which party engaged Basham?

9    All of the other stuff, piercing, all of those claims related to

10   those things aren't in the case.  And Your Honor saw we cited

11   plenty of cases logically.  The only operative -- the only

12   relevant discovery is for what is operative now, and so I would

13   say that we produced documents.  I think we actually produced

14   far more documents than are relevant.

15           I would just note for the record that there is one

16   financial document that counsel raised in her letter that,

17   frankly, was inadvertently produced.  I don't think it should

18   have been produced.  That's why it was one year and not multiple

19   years of financial information, but even if Arizona Beverages

20   Mexico was a party, that document would not be relevant, and I

21   would object to it.  It's just a question of:  Did you engage?

22   Did you pay for it?  What were the services?  And all of these

23   requests go beyond that.

24           So I believe we've fulfilled our duty as to what is

25   relevant to the case, and as Your Honor noted, it may change

1  based on what is permitted or not permitted in an amendment.

2          THE COURT:  Yeah.  I mean, I hear you, Mr. Kimerling,

3  and there's -- again, and I think there is something compelling

4  about that.  At the same time, the question of whether

5  Mr. Menashi and Mr. Cunningham were in their capacities as the

6  points of contact, if you will, for this engagement; whether

7  they were acting on behalf of, it's not really necessarily a

8  question of piercing the corporate veil necessarily.  It's a

9  little bit different than that because there are allegations

10  that Menashi and Cunningham were the points of contact, right?

11  That they were principally involved in communicating about the

12  relationship about the contract.

13          MR. KIMERLING:  Yeah, and we did -- we certainly

14  produced every single email between Mr. Menashi, Mr. Cunningham,

15  and Basham.  We produced 15,000, 20,000 pages of emails.  So we

16  didn't stand by any demarcation and say, well, they were wearing

17  this hat or whatever.  So we did produce all of those.  It's the

18  internal corporate records that I think are not appropriate for

19  discovery, but we certainly produced every email between

20  Mr. Menashi or Mr. Cunningham and Basham.

21          THE COURT:  Well, but here is the -- I mean, the

22  question still remains.  I think Ms. Miller's point is, you

23  know, the emails if nothing else establish that those were the

24  people who were, in fact, having communications with Basham, and

25  it sounds like they were having a large volume of communications

1  with Basham.  Great.  That's useful for everybody to know,

2  and -- but at some level the question is, again, without even

3  having to get to alter ego or piercing the corporate veil or

4  anything of that nature, the question is:  What hats were they

5  wearing at the time they engaged in those communications?

6          Now, oftentimes there would be easy evidence in an

7  email signature.  I mean, my email signature identifies my

8  employer.  I don't have another employer.  I just have the one,

9  and that's true for most, probably all of you as well.  And so,

10 you know, in a lot of circumstances that might be entirely

11 sufficient to answer the question of who these individuals were

12 holding themselves out as being representatives of.  I don't

13 love the structure of that sentence, but anyway, you understand

14 what I am saying.

15         The inquiries I think about -- at least some of the

16 narrower inquiries that Ms. Miller listed in her list of things

17 that she would like to know that she would like to know

18 about about Menashi and Cunningham seem relevant to me.  The

19 broader inquiries about inter-corporate arrangements and things

20 of that nature, you know, I think there is -- I think there is a

21 line there to draw as well about how far we are going into the

22 depths of the high level business relationships between Arizona

23 Beverages USA and ABMX and the others.  You know, there, we are

24 starting to get farther afield to me, but Menashi and Cunningham

25 are critically relevant to this case.  There is no dispute about

 1  that, and that's why you have produced as much as you have about

 2  them.

 3          And so, look, some of the inquiry about who they were,

 4  on whose behalf they were acting could be addressed through a

 5  deposition, I suppose, but some of that might be more clearly

 6  laid out in documents or might be at least corroborated by

 7  documents.

 8          So I wonder if there -- and this is, again, you don't

 9  have to accept this because ultimately I will rule on the

10  questions that you have presented -- but I wonder if there is a

11  compromise position that would allow for something along the

12  lines of documents sufficient to show at this point -- again,

13  this is subject to change if there is an amended complaint --

14  but documents sufficient to show the entity or entities on whose

15  behalf Menashi and Cunningham were acting during their

16  communications with Basham, and I'm not sure exactly what that

17  would be because it -- these communications took place over a

18  long period of time, and I don't know how -- assuming

19  Ms. Miller's understanding is correct, and I'm not sure if

20  that's true -- that Menashi and Cunningham did have periods of

21  time where they were acting on behalf of one entity versus

22  acting on behalf of another, you know, a document-sufficient-to-

23  show type of demand might be a little more complicated than it

24  would be in other circumstances.  But, you know, I think for

25  purposes of trying to get to the bottom of that question, I am

 1  not saying that that's dispositive, right?

 2          I mean, your response, Mr. Kimerling, ultimately may

 3  still be:  But the contract is with Arizona Beverages USA or the

 4  contract is with ABMX, and so it doesn't matter who they were

 5  holding themselves out to be or on whose behalf they were

 6  acting, but I'm not convinced that that doesn't matter, at least

 7  not for discovery purposes.  I think it's relevant, even if it

 8  may not wind up being dispositive.

 9          So I wonder if that could be a path forward that would

10  sort of put aside the sort of broader questions, more sweeping

11  questions about the nature of the interrelationship between the

12  entities and focus more narrowly on documents that would provide

13  that more precise information about Menashi and Cunningham at

14  the relevant periods.

15          Mr. Kimerling, what do you think about that?

16          MR. KIMERLING:  I would have to think about that, but

17  at least that narrows it down.  I would, as Your Honor

18  speculated, take the position that it's really irrelevant.

19  There are documents that I think show which entity was engaged,

20  which entity engaged Basham by Basham's documents to us.  But --

21          THE COURT:  And that might ultimately be the --

22          MR. KIMERLING:  Yeah.

23          THE COURT:  -- the more determinative factor, but

24  again, to the extent that -- that the Arizona Beverages USA or

25  ABMX knew that Menashi and Cunningham were operating on behalf

1  of one entity or the other, and that wasn't communicated to

2  Basham, I don't know what arguments there might be.  That might

3  be, again, too speculative or not really material in light of

4  the existing contracts anyway, but it doesn't strike me as

5  irrelevant, especially for discovery purposes given the broad

6  mandate of Rule 26.

7          And again, the other key evaluative mechanism under

8  Rule 26 is proportionality, and if it were limited to a document

9  sufficient to show, again, within the context of the current

10 operative pleading, I think that would -- it should address any

11 proportionality burden concerns there.  And I am not asking you

12 to commit to that right now, Mr. Kimerling.  It's certainly fine

13 to sort of take that under advisement and think about, frankly,

14 whether there would be some set of documents that would be

15 sufficient to show that for the relevant time period, but I

16 wanted to just float that.

17         And, Ms. Miller, I know that's narrower than what you

18 are looking for, but it does seem to get to the crux of what you

19 are interested in and seems to me to be in line with the scope

20 of what you are alleging, at least, you know, to some extent.  I

21 am not sure it wins the case for you, but I think it is within

22 the ambit at least of the original complaint.

23         So your thoughts on that as a temporary solution at

24 least?

25         MS. MILLER:  Thank you, Your Honor.  I think that that

1  does at least open the door for us to see what was happening

2  within the company, but it also does so in a way that allows the

3  advocates to be advocates.  So I was trying to narrow the

4  request and, you know, we have concerns for proportionality by

5  asking for documents that we know exist and are identifiable

6  like payroll statements and invoices under the personnel-sharing

7  agreement which are specific items and would allow us to see who

8  is ultimately paying the bill, right?  I mean, money talks.  So

9  you can show me a corporate chart that shows that these people

10  had some sort of formal position within ABMX, but that doesn't

11  necessarily -- that doesn't answer the question, do they also

12  have positions?  And more importantly, I know that they had

13  positions for various entities.  I would like to know what those

14  positions are.  I haven't been given a comprehensive view of

15  what are all the hats that they wore.  I just know that they

16  wore multiple hats, but I don't know what hats and on behalf of

17  what entities.

18          But the power of the purse is very important in all

19  power structures, right?  So to know who is ultimately paying

20  for their time really tells you who they stand up for and who

21  they represent.

22          In particular, because we know, for example, that

23  David Menashi was doing different things because on the one hand

24  he is instructing our client.  He is assuring our client that he

25  is going to make payments and extracting compromises from our

1  client in terms of discounts and, you know, discounted rates; at

2  the same time we see him authorizing the transfer of all of

3  Arizona's Mexico assets to Glute 22.  So I want to know what

4  hats did he wear because, yes, maybe there is another amendment

5  coming, but I am entitled to know who else -- who else's

6  interest David Menashi could have been representing while he was

7  telling us that he was going to pay.

8          THE COURT:  Okay.  Well, I mean, listen, payroll

9  records to me I think -- I am not sure what that's even going to

10 show you.  I mean, it's really not clear whether -- you might

11 establish that he was working for multiple entities, but when

12 and how and in what capacity, that's really going to be

13 something you are going to have to probably explore a little bit

14 more at his deposition anyway because I doubt that the documents

15 are going to make it abundantly clear what he was doing at any

16 one particular time, but ultimately, you know, these questions

17 become more relevant if you have your amended complaint in place

18 because you have a bunch of different entities in play there,

19 and, you know, Mr. Cunningham and Mr. Menashi's involvement with

20 those entities is much more directly at issue.

21          Again, there is still going to be the open question of

22 who you entered into this agreement with, and that might be the

23 ultimate question that determines this case regardless of what

24 Mr. Cunningham and Mr. Menashi were saying about who they -- who

25 they were acting on behalf of at any particular moment in time.

 1          I don't think that allowing discovery on that
 2    necessarily answers that question.  I think there is still a lot
 3    to wonder about in terms your legal claim, but the legal
 4    claim, again, is the claim right now that's in the operative
 5    complaint.

 6          So I think, Ms. Miller, you know, you are going to
 7    have to accept something much more limited than what you are
 8    asking for right now because I'm not inclined to grant you broad
 9    discovery into, you know, the inner workings of these companies
10    and, you know, even Menashi and Cunningham's relationship with
11    the companies that are really outside the four corners of the
12    original complaint in the first place.  There is really not much
13    in there that provides a hook for that.  Again, the amended
14    complaint is different and, you know, frankly, we might get back
15    here months from now talking about the proper scope of discovery
16    under the amended complaint if that motion for leave to amend is
17    granted, but, you know, here, it's just a bit far reaching.  And
18    I understand you're interested in knowing a lot of these things.
19    It's hard to sort of separate your interest in knowing that for
20    purposes of the original complaint from the purposes of the
21    potential amended complaint.

22          And, you know, I did look at the cases from our
23    district that you cited, Mr. Kimerling, on those points.  They
24    are not a hundred percent on point because those cases, as far
25    as I could tell, were cases where there was actually no

1   operative complaint, and they were in some sort of liminal stage

2   between a motion having been granted dismissing the case, an

3   amendment coming in; there was another case that involved a

4   bunch of parties that the framing was that there was no

5   operative complaint whatsoever such that discovery could be tied

6   to a pleading at all, but ultimately Judge Cave's decision in

7   *Kirschner* that you quote that says discovery must be granted in

8   the operative complaint, not on a proposed amended complaint,

9   you know, is my understanding of the state of the law as well.

10  I mean, there is not a tremendous amount of case law out there

11  on that point, but that is how we generally operate; and you

12  know, there was some question about whether we should stay

13  discovery all together pending the motion for leave to amend,

14  and I denied that application.  And this isn't exactly a motion

15  to stay discovery; it's just to focus the discovery on the

16  claims and allegations in the original pleading, which is

17  appropriate and is what we need to do.

18          So I have given you a proposal for one way of

19  potentially trying to split the difference between -- between

20  the parties' positions at least with respect to the Cunningham

21  and Menashi information.

22          I haven't heard you say much, Ms. Miller, frankly,

23  about the BMU and international entities.  Maybe you are just

24  taking your cue from my original comments on that, which I think

25  puts those entities outside the scope of what really is

1 appropriate here.  But, you know, I appreciate that you sort of

2 zeroed in on I think what's most important to you at this stage,

3 which is Cunningham and Menashi, and who they were working for

4 at the time they were negotiating with Basham.  And, again, I do

5 think that that is, if not directly addressed as part of the

6 complaint, then certainly it's implicit as an important part of

7 the original complaint.  And so I think there are -- I am

8 hopeful that there are ways of getting at that information that

9 will be sufficient to get you what you need to have an

10 understanding, at least documentary understanding of Cunningham

11 and Menashi's roles, which you could then, you know, use to

12 explore further with them at deposition because, again, I think

13 that's a relevant topic whether or not it turns out to be

14 dispositive or not.

15        So I'm happy to go through other line items here, but

16 again, it's a little tricky for me because I don't have the --

17 there are no formal written objections.  You know, it's not --

18 the items are not sort of laid out on a request-by-request basis

19 in the defendant's response; but I think we've sort of covered

20 conceptually enough here to probably give you more ammunition to

21 go back on both sides and narrow the scope of the disputes.  And

22 I would -- I am going to encourage you to do that and spend the

23 next, say, two weeks working to hopefully resolve the disputes,

24 and if not, crystallize them for me by submitting more precise

25 letters.  And I'm not -- it's not a criticism of the letters.

1 It's just I think we had sort of a high level conceptual issue

2 here that we needed to address, which hopefully we've addressed,

3 and I think this could give you some guidance as you go forward

4 figuring out what's appropriate for now.  And this, of course,

5 is without prejudice to renewing these requests in full if there

6 is -- if there is an amended complaint that brings in these

7 other entities and, you know, necessarily expands the scope of

8 discovery.

9          I mean, Mr. Kimerling's response almost seems to

10 contemplate that.  Of course, he is not waiving any objections

11 as to relevance or scope or whatever else should these requests

12 be propounded in view of an amended complaint, but there does

13 seem to be at least some understanding that we will be dealing

14 with a different universe of responsive documents in a world in

15 which the proposed amended complaint becomes the operative

16 pleading.

17          So my suggestion here, and I will take your input on

18 timing, but my suggestion is that you take the next two weeks,

19 meet and confer, and see if you can reach an agreement as to the

20 current pending demands and what an appropriate scope of

21 production would be; and if not, then let me know by what --

22 what timeline you would need to tee up the disputes for more

23 concrete resolution on an item-by-item basis.

24          I would say that you can report back to me by status

25 letter in two weeks, and if you are not at a point of

1  resolution, it's fine to say, you know, we need one more week to

2  get the formal objections from the subpoena recipients served

3  and then tee up the issues from there.  I am not going to set

4  those specific dates because: A, I am going to be optimistic

5  that maybe you will be able to actually work out the scope of

6  this; and B, you know, there may be scheduling issues that you

7  have.  It's August.  I understand people may be taking some time

8  out of the office.  I hope you are, at least, as we get towards

9  the end of the summer.

10         So I am going to set two weeks as a deadline for the

11 initial meet-and-confer and report back, which again, hopefully

12 will be enough to get it all done, but if not, you can propose a

13 schedule to me in that letter to get the issues teed up, and as

14 long as it's a reasonable schedule, I am likely to -- and it's

15 agreed upon, I am likely grant it.

16         Does that seem like a workable plan for next steps

17 from your perspective, Ms. Miller?

18         MS. MILLER:  Yes, Your Honor.  I think it does.  I

19 think there was one issue that in your final comments came back

20 to my attention, which is a statement I made in my letter that

21 ABMX had agreed to produce financial records.  Following the

22 submission of this letter, I spoke again with Mr. Kimerling, and

23 they are not actually willing to submit -- to produce any

24 further.  Like he said in his comments during the hearing, that

25 was a mistake.  So I think our meet-and-confer will need to

1    address both financial records as well as the -- the Menashi/

2    Cunningham agency question.

3              THE COURT:  Okay.  I mean, that's fine.  Mr. Kimerling

4    explained that his understanding was that that document may have

5    been inadvertently produced, and so that's why he would be

6    taking that position.  I'm not going to wade into that, although

7    I will say that it's not clear to me what -- I am open to being

8    persuaded, but it's not clear to me what the relevance of those

9    financial records is as we sit here today.

10             But, that said, to the extent that they are going to

11   be relevant at all, they would be relevant from ABMX because

12   ABMX is much more intertwined to the pleadings than the other

13   two entities.  So I am not foreclosing the possibility that I

14   could be convinced as to the relevance of the financial records

15   from ABMX, cash flow records; I am just not sure I understand

16   exactly how that pertains to the issues in the current operative

17   pleading, but that's just a preliminary reaction.  I don't want

18   to have an argument about that right now.  I just -- that's my

19   initial thought.  I hadn't really given it deep thought because

20   I understood from the letter that that was not an issue in

21   dispute, but I understand that it is, and Mr. Kimerling has sort

22   of laid out why -- why that is a dispute and, you know, you

23   should definitely meet and confer about that, and if you can't

24   reach a resolution or -- you know, again, some of these

25   resolutions may be just to put it off for another time.  You

1  know, that's a perfectly appropriate dynamic here because we

2  know that there may be discovery in the future with respect to

3  other entities based on how the amended complaint issue is

4  resolved.  So for sure include that item along with the

5  Cunningham and Menashi point and everything else as part of your

6  meet-and-confer.  I mean, I do anticipate that this

7  meet-and-confer will cover all of the points that you've raised

8  here.  It just may be that some of them are more easily

9  addressed than others.

10         MS. MILLER:  One issue that we would need to be

11  conferring about with respect to the schedule would be

12  depositions.  I think we currently have our deposition cutoff

13  date in the operative scheduling order is in mid September.  If

14  we are going to change the schedule, I mean, at this point we

15  have to be scheduling those depositions to really make them

16  happen.  So I think it makes sense to move that date until -- at

17  least until we get an answer on the complaint -- the motion for

18  leave to amend the complaint.

19         THE COURT:  Because your position -- I will hear from

20  you, Mr. Kimerling, in a second -- but your position,

21  Ms. Miller, is would you prefer to hold off on depositions

22  entirely so as not to have to do the depositions twice?  Or is

23  your position that you would want to take depositions based on

24  the current operative complaint and then reopen them if

25  necessary based on the amended complaint?

 1          MS. MILLER:  Well, I have a hard time seeing the Court

 2  entertaining two depositions of the same corporate officers.

 3  So --

 4          THE COURT:  It's usually not a great idea.

 5          MS. MILLER:  So I don't want to use my one bite at the

 6  apple prematurely.

 7          THE COURT:  I think that -- I'm sure that's your

 8  position, Mr. Kimerling.

 9          MR. KIMERLING:  Yes, Your Honor.

10          THE COURT:  Yes.  And I think it makes sense.  I mean,

11  it's more efficient for everybody, frankly.  I mean, there is no

12  real benefit, I don't think, Ms. Miller, to getting a whole lot

13  of testimony on one set of theories and then try to go back and

14  expand that to address others; and there are questions about how

15  much time you would spend, and how thorough you can be, and you

16  will get additional documents potentially if there is an amended

17  complaint.  I think it does make sense to just adjourn the

18  deposition deadline entirely until there is a resolution on the

19  motion for leave to amend.

20          And, Mr. Kimerling, I assume you have no objection to

21  that?

22          MR. KIMERLING:  Correct, Your Honor.

23          THE COURT:  So we will make a note of that in the

24  minute entry from today's proceeding that we will adjourn the

25  deposition deadline, which is currently September 19th, as you

1   noted, Ms. Miller.  We will adjourn that until there is a

2   resolution on the motion for leave to amend, and we will adjourn

3   again the deadline for completion of all discovery, which is

4   October 31st as well, and we will reset that once there is a

5   decision on the motion because, obviously, the dynamics are

6   going to change.  Well, they either will or they won't change, I

7   guess.  But the timing is going to change for those deadlines

8   based on when you get the decision on the motion.

9           So I think -- again, I continue to think that it was

10  worthwhile to have done this amount of discovery because it at

11  least has put us further along in the process, but yes, if there

12  is an amended complaint, there is going to be more discovery,

13  paper written discovery to do, and then the depositions can

14  proceed after that.

15          MR. KIMERLING:  Your Honor, just one issue on the

16  timing two weeks.  I think that would put us the week of

17  August 10th or August 11th.  I am away that entire week.  So

18  would it be possible to just push the status date to the

19  following week, maybe to the 20th or the 21st, something like

20  that?

21          THE COURT:  Yes.  I mean, unless it turns out that

22  Ms. Miller is away that week, in which case we would have to

23  move it up to the 8th, I think.

24          MS. MILLER:  No, the week of the 17th I am here.

25          THE COURT:  Okay.  So then, yes.  That's fine.  Let's

 1  make it August 20th, that's a Wednesday, for the status letter.

 2  And again, that will be a letter that will tell me where things

 3  stand on your meet-and-confer process and whether there are

 4  other issues that need to be resolved, and if there are issues

 5  that need to be resolved, your proposed schedule for teeing

 6  those issues up, which I think would involve written objections,

 7  at least to -- as to whatever items are still in dispute.

 8          So again, I think one -- I'm open to creative

 9  solutions here because we are sort in an in-between state when

10  it comes to this discovery.  So if there are ten discovery

11  demands, but Ms. Miller is only really pressing on two of them,

12  for example, it would be fine from my perspective if there were

13  just written objections as to those two demands so that there

14  would be something specific to work on with the idea that the

15  defendants, the subpoena recipients, potential future defendants

16  are reserving their rights with respect to all others, and that

17  the plaintiff is accepting the limited scope of objections with

18  the understanding that the other matters will be addressed later

19  on, you know, again, something that's efficient in terms of

20  teeing these matters up and also cost effective for both sides,

21  and I think a shorter response -- if there are only two issues

22  that are really in dispute, you should be able to get it done

23  faster than if you had to do responses and objections on ten or

24  twelve or fifteen items or whatever it is.

25          So I am open to sort of a creative solution and

1  approach there, and I think you can think about what makes most

2  sense and, look, no one would be waiving anything by only

3  putting in the limited objections because we are basically

4  deferring the discovery on the remainder of the issues until

5  after a decision on the motion to leave to amend.

6           Sometimes I suggest things like that, and it winds up

7  making things more complicated.  I am really trying to make

8  things simpler.  You know, it's really in service of trying to

9  have a simpler approach.  If you ultimately think that that's

10 ridiculous and you'd just rather do it all at once so you are

11 not trying to keep track of so many things, have at it.  I am

12 really just trying to offer a solution that might be more

13 efficient.  If you don't think that that's more efficient or is

14 leading to excessive negotiation on the efficiency measure,

15 then, you know, you can just do it in the traditional way.  I am

16 really just trying to be constructive with that suggestion.

17 So --

18          Okay.  So August 20th for that update.  And we will

19 set a next conference date after that.  In the meantime, I will

20 continue to try to touch base with Judge Román about

21 specifically what he wants to do about that motion and, look, if

22 he has me do it, I will be able to give you a little bit more of

23 an idea of when you can expect a decision on it.  If he is going

24 to do it, then I cannot give you that idea.

25          So I may have more information on that.  Hopefully, I

1  will have more information on that by the next time we speak.

2          Okay.  I think that covers everything for today.

3          Ms. Miller, was there anything further we should

4  address from the plaintiff's perspective?

5          MS. MILLER:  No, that's all.  Thank you, Your Honor,

6  for your time.

7          THE COURT:  Okay.  Mr. Kimerling, anything further we

8  should address from the defendant's perspective?

9          MR. KIMERLING:  Nothing further, Your Honor.  Thank

10 you.

11         THE COURT:  Okay.  We will stand adjourned.  Hope

12 everybody continues to enjoy the summer.  I will look forward to

13 hearing from you on August 20th, and we will go from there.

14 Take care, everybody.

15         MR. KIMERLING:  Thank you.

16                          -o0o-

17

18

19

20         Certified to be a true and accurate transcript of the

21 digital electronic recording to the best of my ability.

22         /s/ Darby Ginsberg

23         U.S. District Court
           Official Court Reporter

24

25